IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BUREAU OF NATIONAL AFFAIRS,
INC.,

    *Plaintiff*,

    v.

MARCIA CHASE and
PATRICK CHASE,

    *Defendants*.

Civil Action No. ELH-11-1641

**MEMORANDUM OPINION**

In this case, I must consider whether a health benefits plan is entitled to reimbursement of

medical expenses from the proceeds of a tort settlement received by its beneficiary from a third

party.  Bureau of National Affairs, Inc. ("BNA"), plaintiff, as fiduciary of the Bureau of National

Affairs, Inc. Welfare Benefit Plan (the "Plan"), sued Marcia Chase and her husband, Patrick

Chase, defendants, to recover for expenses that the Plan paid for Ms. Chase's medical care.[1]

The parties agreed to defer expert discovery until the completion of factual discovery and

the resolution of any dispositive pretrial motions.  *See* Scheduling Order at 2 (ECF 12).  After the

completion of factual discovery, the parties filed cross-motions for summary judgment, which

are now pending.[2]  No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For

the reasons that follow, I will deny both motions.

---

[1] Mr. Chase was not sued in his capacity as Ms. Chase's husband, but rather as her
attorney.  *See* Complaint ¶ 3 (ECF 1).  As a member of this Court's bar, Mr. Chase has
represented himself and his wife in this litigation.  He negotiated the settlement with FMH, and
BNA alleges that Mr. Chase holds the disputed funds in his client trust account.  *Id.* ¶ 12.

[2] I have considered BNA's motion for summary judgment (ECF 18-1) (collectively with
its supporting memorandum, ECF 18-2, "BNA Motion"); the Chases' combined opposition to
the BNA Motion and cross-motion for summary judgment (ECF 21) (collectively with its
supporting memorandum, ECF 21-1, "Chase Motion"); BNA's combined opposition to the

**Factual Background**

The Plan is a health benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The Plan is self-funded by BNA for the benefit of its employees and their spouses and dependents, but is administered on BNA's behalf by Aetna Life Insurance Company ("Aetna"). *See* BNA Motion at 2-3. Ms. Chase is a beneficiary of the Plan.

<u>A.  Ms. Chase's Medical Care</u>

In December 2009, Ms. Chase was diagnosed with two separate and primary cancers: a "stage 2b" malignant breast tumor and a "stage 3b" malignant rectal tumor. At around the same time, she was also diagnosed with a sixteen centimeter fibrous tumor of the uterus. *See* Chase Motion at 2; BNA Motion at 7. In the early months of 2010, Ms. Chase underwent a course of radiation and chemotherapy treatment in preparation for surgeries to remove the rectal and uterine tumors. Chase Motion at 2.

Both surgeries were performed on May 5, 2010, at the Washington Hospital Center (the "Hospital"). The first surgery, performed by Dr. Abbie Fields, was a complete hysterectomy for the purpose of removing the fibrous uterine tumor. The rectal tumor was removed in the second surgery, performed by Dr. Jennifer Ayscue. In order to remove the rectal tumor, Dr. Ayscue performed an abdominal perineal resection. *See* Chase Motion at 2. Defendants described this procedure in their motion, *id.* at 2-3:

> An abdominal perineal resection of the rectum is a major healthcare operation that involves removal of a patient's lower bowels and rebuilding a new passage route for bodily waste with the remaining colon. The new passage route for bodily waste is created from the remaining portion of the colon to an opening in the abdominal wall (colostomy).[3]

Chase Motion and reply in support of the BNA Motion ("BNA Reply") (ECF 25); and the Chases' reply ("Chase Reply") (ECF 29), as well as the parties' exhibits.

[3] The Chases' description of the procedure is consistent with the description of an abdominoperineal resection as provided in STEDMAN'S MEDICAL DICTIONARY, at 1673 (28th

As a result of the surgeries, Ms. Chase had two separate surgical closures: a lower abdominal wound closed with sutures, and a perineal wound closed with sutures and an omental flap.  Chase Motion at 3.  Ms. Chase spent eight days in the Hospital, recovering from the surgeries, and was discharged on May 13, 2010.  *Id.*

Over the next two weeks, nurses employed by Frederick Memorial Hospital Home Health Care ("FMH")[4] came to the Chases' home on five occasions (May 15, 18, 21, 24, and 27, 2010) to provide wound care and pain management, to change Ms. Chase's colostomy appliance, and to educate the Chases in the care of the wounds.  *Id.*  According to the Chases, the FMH employees committed "several lapses in providing an acceptable standard of care" during these visits.  *Id.*  For instance, on one occasion, an FMH nurse did not change the colostomy appliance, although the previous nurse had specifically stated that it needed to be changed.  *Id.*  More important, the nurses allegedly failed to note that Ms. Chase's perineal wound opened and became infected.  Her condition deteriorated during this period, to the point that she was "very ill" by the end of the two-week period.  *Id.*  Ms. Chase was experiencing "pressure" in her rectal area and a foul odor emanated from the changed wound dressing.  *Id.*  On May 27, 2010, Mr. Chase asked the FMH nurse about the odor and the nurse responded that "everything is ok."  *Id.*

Everything was not "ok," however.  The next day, May 28, 2010, Ms. Chase became extremely ill, experiencing severe dizziness and vomiting.  That afternoon, she went to a previously scheduled appointment with her rectal surgeon, Dr. Ayscue, who determined that Ms.

---

ed.): "[A] surgical cancer treatment involving r[esection] of the lower sigmoid colon, rectum, anus, and surrounding skin and formation of a sigmoid colostomy; performed as a synchronous or sequential transabdominal and perineal procedure."

[4] Apparently, FMH Home Health Care is a subsidiary of Frederick Memorial Hospital, Inc.  I refer to Frederick Memorial Hospital, Inc. and FMH Home Health Care collectively as "FMH."

Chase had a "breakdown of her perineal wound, as well as a foul smelling drainage." *Id*. Ms. Chase was admitted to the Hospital for "urgent debridement of the perineal wound." *Id*.

During the debridement procedure, Dr. Ayscue discovered that "the perineal wound had opened at the superficial level, where sutures had come undone." *Id*. at 4. Dr. Ayscue removed the remaining sutures, opened the perineal wound, and discovered "a deep abscess cavity," in which the tissue was infected and "grey in color and with a foul smell." *Id*. The "posterior vaginal closure was also noted to be interrupted and infected." *Id*. After the wound was adequately debrided, a "large Kerlix packing was placed in the wound," but the wound was otherwise left open to heal. *Id*. Four days later, on June 1, 2010, Ms. Chase underwent yet another surgical procedure to "close the vaginal wall." *Id*. She was discharged from the Hospital on June 2, 2010, *id.*, and underwent a lengthy, months-long recovery during which, pursuant to the standard of care for treatment of her perineal wound infection, her wound was "left open to heal from the inside out." *Id*. at 5.

### B.  Coverage by the Plan

The Plan paid claims associated with Ms. Chase's second round of surgeries and subsequent medical treatment for the infection to the perineal wound site, in the amount of $47,246.10. *See* BNA Motion at 7; *see also* Ex.5C to BNA Motion (ECF 32-1). However, the Plan did not pay for any of the care provided by FMH. *See* Ex.8 to Chase Motion (ECF 21-9); Ex.5C to BNA Motion.[5]

The parties agree that the Plan provides benefits subject to the provisions of a document, submitted as Exhibit 5A to the BNA Motion (ECF 18-8), which the parties sometimes refer to as the Summary Plan Description ("SPD"), and sometimes refer to as the Plan itself. I will refer to

---

[5] The parties have not indicated the cost of FMH's care or who paid for it.

the document as the SPD.[6]

"Summary Plan Description" is a term of art under ERISA. Every benefits plan governed by ERISA is required to provide a "summary plan description" to each beneficiary. *See* 29 U.S.C. §§ 1021(a)(1), 1022(a). A summary plan description is not the written instrument establishing the plan itself. *See id.* § 1102(a)(1) (requiring that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument"). Rather, the summary plan description, as its name suggests, is a summary of certain plan provisions, which must "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.* § 1022(a). Among other things, a summary plan description must contain "the plan's requirements respecting eligibility for participation and benefits"; the "procedures to be followed in presenting claims for benefits under the plan"; and "the remedies available under the plan for the redress of claims which are denied." *Id.* § 1022(b).

Although the summary plan description is not the written instrument that establishes the plan, the Fourth Circuit has held that the "representations in a SPD control over inconsistent provisions in an official plan document," because "the SPD is 'the statutorily established means of informing participants of the terms of the plan and its benefits,' and the 'employee's primary source of information regarding employment benefits.'" *Aiken v. Policy Mgmt. Sys. Corp.*, 13 F.3d 138, 140 (4th Cir. 1993) (quoting *Pierce v. Security Trust Life Ins. Co.*, 979 F.2d 23, 27 (4th Cir. 1992)).

---

[6] The parties agree that BNA's Exhibit 5A is the SPD for the Plan. However, BNA's Exhibit 5A is not titled as an SPD. Rather, its title is "Benefit Plan: What Your Plan Covers and How Benefits are Paid." *See* ECF 18-8 at i. In addition, the document refers to itself as the "Booklet," and states: "This *Booklet* is part of the *Contract* between Aetna and the Customer. The *Contract* determines the terms and conditions of coverage." *Id.* at 1 (italics in original).

The parties have not submitted any other written instrument governing the Plan, and they agree that the language in the SPD is controlling.  *See* BNA Motion at 3; Chase Motion at 7. Their dispute turns on the proper interpretation of the SPD's language.

The language at issue is contained in a section of the SPD entitled "Subrogation and Right of Recovery Provision."  In relevant part, it provides as follows, SPD at 50-52 (underline emphasis added):

**Subrogation and Right of Recovery Provision**

*Definitions*
As used throughout this provision, the term "Responsible Party" means any party actually, possibly, or potentially responsible for making any payment to a Covered Person due to a Covered Person's injury, illness, or condition.  The term "Responsible Party" includes the liability insurer of such party or any insurance coverage.

\* \* \*

For purposes of this provision, a "Covered Person" includes anyone on whose behalf the plan pays or provides any benefit including, but not limited to, the minor child or dependent of any plan member or person entitled to receive any benefits from the plan.

*Subrogation*
Immediately upon paying or providing any benefit under this plan, the plan shall be subrogated to (stand in the place of) all rights of recovery a Covered Person has against any Responsible Party with respect to any payment made by the Responsible Party to a Covered Person due to a Covered Person's injury, illness, or condition to the full extent of benefits provided or to be provided by the plan.

*Reimbursement*
In addition, <u>if a Covered Person receives any payment from any Responsible Party or Insurance Coverage as a result of an injury, illness, or condition, the plan has the right to recover from, and be reimbursed by, the Covered Person for all amounts this plan has paid and will pay as a result of that injury, illness, or condition, from such payment, up to and including the full amount the Covered Person receives from any Responsible Party</u>.

*Constructive Trust*
By accepting benefits (whether the payment of such benefits is made to the Covered Person or made on behalf of the Covered Person to any provider) from the plan, the Covered Person agrees that if he or she receives any payment from any Responsible Party as a result of an injury, illness, or condition, he or she will

serve as a constructive trustee over the funds that constitutes such payment. Failure to hold such funds in trust will be deemed a breach of the Covered Person's fiduciary duty to the plan.

### Lien Rights

Further, the plan will automatically have a lien to the extent of benefits paid by the plan for the treatment of the illness, injury, or condition for which the Responsible Party is liable.  The lien shall be imposed upon any recovery whether by settlement, judgment, or otherwise, including from any Insurance Coverage, related to treatment for any illness, injury, or condition for which the plan paid benefits.  The lien may be enforced against any party who possesses funds or proceeds representing the amount of benefits paid by the plan including, but not limited to, the Covered Person, the Covered Person's representative or agent; Responsible Party; Responsible Party's insurer, representative, or agent; and/or any other source possessing funds representing the amount of benefits paid by the plan.

### First-Priority Claim

By accepting benefits (whether the payment of such benefits is made to the Covered Person or made on behalf of the Covered Person to any provider) from the plan, the Covered Person acknowledges that this plan's recovery rights are a first priority claim against all Responsible Parties and are to be paid to the plan before any other claim for the Covered Person's damages.  This plan shall be entitled to full reimbursement on a first-dollar basis from any Responsible Party's payments, even if such payment to the plan will result in a recovery to the Covered Person which is insufficient to make the Covered Person whole or to compensate the Covered Person in part or in whole for the damages sustained. The plan is not required to participate in or pay court costs or attorney fees to any attorney hired by the Covered Person to pursue the Covered Person's damage claim.

### Applicability to All Settlements and Judgments

The terms of this entire subrogation and right of recovery provision shall apply and the plan is entitled to full recovery regardless of whether any liability for payment is admitted by any Responsible Party and regardless of whether the settlement or judgment received by the Covered Person identifies the medical benefits the plan provided or purports to allocate any portion of such settlement or judgment to payment of expenses other than medical expenses.  The plan is entitled to recover from any and all settlements or judgments, even those designated as pain and suffering, non-economic damages, and/or general damages only.

### Cooperation

The Covered Person shall fully cooperate with the plan's efforts to recover its benefits paid.  It is the duty of the Covered Person to notify the plan within 30 days of the date when any notice is given to any party, including an insurance

company or attorney, of the Covered Person's intention to pursue or investigate a claim to recover damages or obtain compensation due to injury, illness, or condition sustained by the Covered Person.  The Covered Person and his or her agents shall provide all information requested by the plan, the Claims Administrator or its representative including, but not limited to, completing and submitting any applications or other forms or statements as the plan may reasonably request.   Failure to provide this information may result in the termination of health benefits for the Covered Person or the institution of court proceedings against the Covered Person.

The Covered Person shall do nothing to prejudice the plan's subrogation or recovery interest or to prejudice the plan's ability to enforce the terms of this plan provision.   This includes, but is not limited to, refraining from making any settlement or recovery that attempts to reduce or exclude the full cost of all benefits provided by the plan.

The Covered Person acknowledges that the plan has the right to conduct an investigation regarding the injury, illness, or condition to identify any Responsible Party.  The plan reserves the right to notify responsible Party and his or her agents of its lien.   Agents include, but are not limited to, insurance companies and attorneys.

***Interpretation***
In the event that any claim is made that any part of this subrogation and right of recovery provision is ambiguous or questions arise concerning the meaning or intent of any of its terms, the Claims Administrator for the plan shall have the sole authority and discretion to resolve all disputes regarding the interpretation of this provision.[7]

## C.  Settlement of Claim Against FMH

The Chases concluded that the FMH nurses were negligent in their care of Ms. Chase.  In particular, the Chases believed that the nurses should have noticed that the perineal wound had opened and that the wound had become infected.   In their view, this negligence caused Ms. Chase to suffer two weeks of excruciating pain leading up to Dr. Ayscue's discovery of the infection.  Initially, the Chases also believed that FMH's failure to discover the infection earlier necessitated the second round of surgeries in late May and early June 2010, as well as Ms.

---

[7] "Claims Administrator" is not defined in the SPD, and so it is unclear whether the term refers to Aetna, to The Rawlings Company, LLC (Aetna's subcontractor for subrogation and reimbursement recovery), or to another person or entity.  The parties have not submitted any information pertaining to review by a Claims Administrator.

Chase's painful, long recovery from these surgeries.  Moreover, Ms. Chase's lengthy recovery from the second round of surgeries resulted in a delay in beginning her post-surgical chemotherapy, which caused the Chases to worry that "the delay [might] cause [Ms. Chase's] cancer to return."  ECF 18-17 at 13.

In December 2010, the Chases submitted a demand letter to Barbara Stanley, the Director of Risk Management for FMH, seeking to recover $53,624 in medical bills, $37,036 in lost wages, $859 for travel expenses, and $550,000 for pain and suffering, for a total demand of $641,519.  *See* ECF 33-1 at 3; *see also* Affidavit of Barbara McClellan Stanley ¶¶ 2-6 ("Stanley Aff."), Ex.5 to Chase Motion (ECF 21-6).  In February 2011, the Chases submitted a revised demand letter seeking additional lost wages, for a revised total demand of $647,442.20.  *See* ECF 33-1 at 1.

Because the Chases sought recovery for medical bills on the basis of their belief that the FMH nurses' alleged negligence had necessitated the second round of surgeries, in February 2011, they also notified Aetna, the Plan's administrator, of their claim against FMH.  *See* Chase Motion at 5.  In turn, Aetna alerted its subcontractor, The Rawlings Company, LLC ("Rawlings"), regarding the Chases' claim.  Rawlings is retained by Aetna to protect its subrogation and reimbursement rights under the Plan.  *See* BNA Motion at 3.  On February 17, 2011, Michelle McDonald, a Senior Recovery Analyst for Rawlings, wrote to Mr. Chase, asserting a "lien/claim for medical benefits paid on behalf of MARCIA CHASE," and requesting further information from the Chases.  Ex.5D to BNA Motion (ECF 18-11).  On February 24, 2011, and March 1, 2011, Ms. McDonald sent follow-up letters to Mr. Chase and to Ms. Stanley of FMH, notifying them of updates to the amount of the asserted lien.  *See* Ex.5E & Ex.5F to

BNA Motion (ECF 18-12 & 18-13).[8]

In the meantime, pursuant to medical records authorizations provided by the Chases, a general surgeon retained by FMH reviewed Ms. Chase's medical records.  *See* Stanley Aff. ¶¶ 4-7.  Ms. Stanley of FMH and the Chases met on or about March 2, 2011, to discuss settlement of the Chases' claim against FMH.  Notably, at that meeting, Ms. Stanley informed the Chases that FMH's surgeon had concluded that the care rendered by FMC did not cause or contribute to the medical injuries claimed by the Chases because, even if the infection had been detected earlier, the same subsequent surgical care would have been required, including extensive debridement and "packing" of the wound and leaving the wound open to heal.  However, FMH's surgeon also concluded that, if the FMH nurses had detected the infection earlier, they might have prevented Ms. Chase from experiencing several additional days of severe physical pain before the infection was discovered.  *See* Stanley Aff. ¶ 7; *see also* Ex.6 to BNA Motion at 3 (ECF 32-2) (responses to interrogatories by Mr. and Ms. Chase).[9]  Ms. Stanley communicated the findings of FMH's surgeon to the Chases and, on that basis, stated that FMH denied their demand for compensation

---

[8] The letter of March 1, 2011 asserted a lien amount of $48,771.73, *see* Ex.5F to BNA Motion, and the letter of February 24, 2011 asserted a lien amount of $49,518.67.  *See* Ex.5E to BNA Motion.  Exhibit 5C to BNA's motion, which is an itemization of the claims paid by the Plan in connection with the care of Ms. Chase's wound infection, supports the figure of $49,518.67.  However, in this lawsuit, BNA has only sought to recover $47,246.10 from the Chases.  *See* Complaint ¶¶ 9, 23.  This slight discrepancy has not been explained by either side.  However, as far as I can determine, the $47,246.10 sought by BNA corresponds to expenditures in connection with Ms. Chase's second set of surgeries and related care.  It does not appear that BNA seeks to recover for expenses related to the first set of surgeries.

[9] BNA objects on hearsay grounds to consideration of Ms. Stanley's report of the findings of FMH's surgeon.  However, at this juncture, the evidence is not being offered or considered "to prove the truth of the matter asserted" by the surgeon, and thus is not hearsay within the meaning of F.R.E. 801(c).  As noted, the parties agreed to postpone expert discovery until after resolution of the pending motions.  Therefore, the issue of whether the delay in detecting Ms. Chase's infection actually altered the course of her surgical treatment is beyond the scope of the present motions.  I have considered Ms. Stanley's report as to the findings of FMH's surgeon only as background information explaining the actions taken by the Chases and FMH.

- 10 -

for medical treatment and other economic damages as a result of the infection itself.  However, Ms. Stanley offered on behalf of FMH to compensate the Chases for Ms. Chase's severe physical pain during the two-week period during which she was receiving care from the FMH nurses.  *See* Stanley Aff. ¶ 8; Ex.6 to BNA Motion at 3.

At the meeting with Ms. Stanley, the Chases initially declined FMH's settlement offer, stating that they intended to discuss FMH's surgical review with Ms. Chase's surgeon, Dr. Ayscue.  *See* Stanley Aff. ¶ 9; Ex.6 to BNA Motion at 3.  When the Chases discussed the matter with Dr. Ayscue, the doctor agreed with FMH's surgeon that the debridement surgery was "probable anyway."  Ex.6 to BNA Motion at 3.  Mr. Chase also performed some research into the medical literature concerning abdominal perineal resection, and learned that "there is a significantly higher incident [sic] of wound failure when a patient has neo-adjuvent chemotherapy/radiation," as Ms. Chase underwent.  *Id.*[10]

Accordingly, on March 21, 2011, the Chases agreed to FMH's settlement offer and executed a "General Release of All Claims" prepared by FMH.  *See* Release, Ex.5I to BNA Motion (ECF 18-16).  In relevant part, the Release states:

> The Undersigned Releasors, **MARCIA JOANN CHASE AND PATRICK E. CHASE**, in consideration of the payment of **Three Hundred Thousand dollars and no cents ($300,000.00),** in compensation for pain and suffering only, receipt of which is hereby acknowledged, do hereby release and forever discharge the Releasees, **Frederick Memorial Hospital, Inc., and FMH Home Health Care**, their heirs, principals, agents, employees, employers, executors, administrators, insurers, successors and assigns, of and from all actions, causes of action, damages, or demands of whatsoever kind or character which the Releasors now have or may hereafter have, foreseen and unforeseen, known or unknown, asserted or unasserted, on account of all injuries, or injurious result, direct or indirect. arising or to arise, and caused by or resulting from care and services

---

[10] The Chases have submitted as exhibits some of the medical literature that Mr. Chase reviewed.  *See* Ex.6 to Chase Motion (ECF 21-7).  I have not considered this literature because, as discussed, the question of the actual precipitating cause of the debridement surgery is beyond the scope of the issues presently before me.

rendered to Marcia Joann Chase from May 15 through May 27, 2010 (hereafter "the Incident").

\*   \*   \*

The Releasors further understand and agree that this settlement is the compromise of a doubtful and disputed claim, and that the payment made is not to be construed as an admission of liability on the part of the Releasees by whom liability is expressly denied.

The Parties (the Releasors and the Releasees) agree and acknowledge that the terms and conditions of the settlement and this General Release are confidential and are not to be disclosed by the Parties to any person or entity.  Further, the Parties agree not to divulge, discuss or comment regarding any fault or lack of fault of any of the Parties, hereto.  The only permissible disclosure concerning the disposition of the claim shall be limited to the fact that a settlement was reached between the parties, and then only in response to a direct inquiry.[11]

Pursuant to the settlement, the Chases received payment of $300,000 from FMH, which remains in the Chases' possession.  In subsequent correspondence between Mr. Chase and Ms. McDonald of Rawlings, Mr. Chase provided Rawlings with a copy of the Release and other documentation relating to the settlement, but maintained that the Plan was not entitled to a lien over the proceeds of the settlement, because the settlement was for pain and suffering only, rather than reimbursement for medical expenses paid by the Plan, and that "it was clear [that Ms. Chase's] infection was not caused by FMH Home Health Care."  Ex.5B to BNA Motion (ECF 18-9) (letter from Mr. Chase to Ms. McDonald, dated April 12, 2011).  It is undisputed, however, that the Chases did not involve Rawlings, Aetna, or any other agent of the Plan in the negotiation of the settlement with FMH.

The parties have not submitted any documentation as to the basis for the Plan's administrative determination that it is entitled to reimbursement.  The Chases assert: "At no time has Aetna provided the Chases with any administrative record or any affidavit stating what

---

[11]  In a previous ruling, *see* ECF 30, the Court held that, despite the confidentiality provision of the Release, the Release could not be kept under seal in this proceeding under applicable law.

documents comprise the administrative record, other than medical bills, despite the request of the Chases." Chase Motion at 6.

BNA filed this lawsuit on June 16, 2011, two months after Mr. Chase's letter to Ms. McDonald of Rawlings on April 12, 2011.

## Discussion

### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at

249.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment.  *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003).  "Both motions must be denied if the court finds that there is a genuine issue of material fact.  But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

Both sides agree that the conventional summary judgment standard of review set forth above is appropriate here.  *See* BNA Motion at 10-12; Chase Motion at 7.  I note, however, that the Plan gives the "Claims Administrator" discretion over the interpretation of the subrogation and reimbursement provision.  *See* page 8, *supra*.  When an ERISA benefits plan gives its administrator such discretion, a court ordinarily must review the plan administrator's interpretation under an abuse of discretion standard.  *See Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 260 (4th Cir. 2009); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109-10 (1989); *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000) (synthesizing factors for evaluating an ERISA plan administrator's exercise of discretion.

In this case, however, I have not been provided with any information pertaining to a review or decision by the Plan's administrator.  Nor has BNA suggested that its interpretation of the SPD is entitled to deferential review.  In any event, an "administrator's discretion never

- 14 -

includes the authority 'to read out unambiguous provisions' contained in an ERISA plan."
*Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 639 (4th Cir. 2007) (quoting
*Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005)).  Indeed, to ignore
the plain language of the plan "constitutes an abuse of discretion."  *Blackshear*, 509 F.3d at 639;
*accord Day v. AT&T Disability Income Plan*, 685 F.3d 848, 853 (9th Cir. 2012) ("'ERISA plan
administrators abuse their discretion if they . . . construe provisions of the plan in a way that
conflicts with the plain language of the plan.'") (citation and some internal quotations marks
omitted); *Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 362 (7th Cir. 2011)
("'[U]nambiguous terms of a[n] [ERISA] plan leave no room for the exercise of interpretive
discretion by the plan's administrator.'"); *Admin. Cmte. of Wal-Mart Stores, Inc. Assocs.' Health
& Welfare Plan v. Gamboa*, 479 F.3d 538, 542 (8th Cir. 2007) ("An interpretation that conflicts
with the plain language of a health and welfare plan is an abuse of discretion . . . .").

Thus, even if BNA's position in this litigation is the product of a determination made by
the Plan's administrator, no deference is owed to that determination if it contradicts the
unambiguous language of the SPD.

## B.  ERISA

BNA filed suit pursuant to Section 502(a)(3) of ERISA, which is codified as amended at
29 U.S.C. § 1132(a)(3).  ERISA is a "'comprehensive and reticulated statute,' the product of a
decade of congressional study of the Nation's private employee benefit system," which governs
most employee benefit plans in the United States.  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251
(1993) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)).  A
primary purpose of ERISA is to "ensure the integrity of written, bargained-for benefit plans."
*United McGill Corp. v. Stinnett,* 154 F.3d 168, 172 (4th Cir. 1998).  "To achieve this objective,

the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." *Mid Atl. Med. Servs., LLC v. Sereboff*, 407 F.3d 212, 220 (4th Cir. 2005) (internal quotation marks omitted) *aff'd*, 547 U.S. 356 (2006).

Included within ERISA's "carefully crafted and detailed enforcement scheme," *Mertens*, 508 U.S. at 254, is the private right of action contained in Section 502(a)(3) of ERISA. That provision authorizes a civil action "by a participant, beneficiary, or fiduciary" of an employee benefit plan "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan[.]" 29 U.S.C. § 1132(a)(3).

In a series of cases, the Supreme Court has "interpreted the term 'appropriate equitable relief' in § 502(a)(3)," holding that it refers "to 'those categories of relief' that, traditionally speaking (*i.e.*, prior to the merger of law and equity) 'were *typically* available in equity.'" *CIGNA Corp. v. Amara*, ___ U.S. ___, 131 S. Ct. 1866, 1878 (2011) (emphasis in original) (citations and some internal quotation marks omitted). In *Mertens*, *supra*, 508 U.S. at 255-58, the Supreme Court held that § 502(a)(3) does not authorize a suit seeking an award of money damages. And, in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), the Court concluded that § 502(a)(3) permits a suit seeking restitution by imposition of a constructive trust or equitable lien; however, recovery in such an action is limited to "particular funds or property in the defendant's possession," rather than "imposition of personal liability for the benefits . . . conferred," which would constitute legal relief akin to money damages, not equitable relief. *Id.* at 214. More recently, in *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356 (2006), the Court held that, where the fiduciary of a benefit plan seeks to impose an equitable lien on funds in a beneficiary's possession pursuant to an express provision in the plan

establishing the lien, the fiduciary may recover under Section 502(a)(3), even if the plaintiff cannot establish through strict tracing that the funds in the plaintiff's possession were the specific funds to which the plan was entitled. *See id.* at 364-69.

In this case, BNA asserts two counts against the Chases: (1) "Violation of ERISA" and (2) "Right of Reimbursement." Complaint at 4. Both claims arise under Section 502(a)(3). *See* Complaint ¶¶ 14, 23. With respect to both counts, BNA asks the Court to "impose a constructive trust and equitable lien in favor of Plaintiff against the settlement proceeds," declare that BNA is the owner of the settlement proceeds up to the amount of its lien, order the Chases to "turn over the settlement proceeds up to the amount of Plaintiff's lien," and to award judgment, with costs, in its favor. *Id.* ¶ 24.

The parties do not dispute that the SPD contains a provision establishing a lien over sums that a beneficiary recovers from third parties in certain circumstances, so as to permit the Plan to assert a cause of action for an equitable lien by agreement, pursuant to *Sereboff*. The parties also agree that the disputed funds are in the Chases' possession, and therefore can be reached by the remedies of constructive trust or equitable lien, pursuant to *Great-West* and *Mertens*. In sum, there is no dispute that this suit is a proper action for "appropriate equitable relief" under Section 502(a)(3) of ERISA. But, the parties dispute whether the proceeds of the settlement from FMH are, in fact, subject to the Plan's lien and right of reimbursement. Resolution of this dispute turns on interpretation of the language of the SPD.

## C. BNA's Motion

According to BNA, the SPD entitles it to a lien over the proceeds of the Chases' settlement with FMH. As BNA sees it, due to the broad language of the SPD, it is of no consequence that the settlement was designated exclusively for pain and suffering, and the

question of whether the alleged injuries to Ms. Chase were caused by FMH's conduct is also of no consequence.  Plaintiff points to language in the SPD providing that the Plan "is entitled to recover from any and all settlements or judgments, *even those designated as pain and suffering*, non-economic damages, and/or general damages only."  SPD at 51 (emphasis added).  Plaintiff articulates the reason for inclusion in the SPD of such broad subrogation language: if a plan were limited to reimbursement from settlements specifically designated as compensation for medical expenses, "plan participants and beneficiaries could easily circumvent a plan's subrogation/reimbursement rights by negotiating with the tortfeasor so as to label all of the damages received as 'pain and suffering,' even when they are actually intended to compensate for medical expenses."  BNA Motion at 17.  It adds: "Such a scheme would severely undercut an ERISA plan's interest, indeed its duty, in keeping it perpetually solvent."  *Id.*

One of the cases cited by plaintiff, *G.R. Herberger's, Inc. v. Erickson*, 17 F. Supp. 2d 932 (D. Minn. 1998), provides a paradigmatic example of the type of mischief such plan provisions are intended to preclude.  In *Herberger's*, a plan beneficiary suffered a severe spinal cord injury in a bicycle accident that occurred on the property of a school.  *Id.* at 933.  The beneficiary sued the school and obtained a $1.2 million settlement.  *Id.*  The settlement agreement "specifically stated that the monetary recovery precluded any past or future medical expenses."  *Id*.  Nonetheless, the plan sought to be reimbursed out of the settlement proceeds for the medical expenses it had paid on behalf of the beneficiary.  *Id.*  The plan's subrogation clause entitled the plan to "'be subrogated and succeed to the Covered Person's right of recovery for medical expenses incurred against any third-party, and the Covered Person shall pay over to the Plan Administrator all sums recovered, by suit, settlement, or otherwise, on account of such medical expenses incurrred,'" up to the amount of benefits paid by the plan.  *Id.* (quoting plan).  The

beneficiary argued that because her settlement agreement specifically excluded medical expenses, her plan had no entitlement to the proceeds. The court rejected the beneficiary's reliance "on artful language insinuated into her settlement agreement," holding that the plaintiff's argument would result in "unjust enrichment to a party whose attorneys use lexicological legerdemain to avoid ERISA Plan reimbursement." *Id.* at 936.

*Steffens v. BlueCross BlueShield of Illinois*, *supra*, 804 N.W.2d 196 (Wis. 2011), another case upon which BNA relies, is also noteworthy. In *Steffens*, the Wisconsin Supreme Court held that a plan administrator did not abuse its discretion in determining that the plan was entitled to reimbursement from a beneficiary's settlement arising out of the beneficiary's injuries in a car accident. In the litigation against the alleged tortfeasor, the beneficiary had averred under oath on several occasions, both before and after the plan administrator made its determination as to reimbursement, that the back injury the beneficiary sustained in the car accident necessitated his lumbosacral fusion surgery. *Id.* at 212. After he obtained the settlement, however, the beneficiary "did an about-face and claimed that the surgery did not arise out of the accident." *Id.* at 213. The *Steffens* Court stated: "[B]ecause Steffens himself averred both before and after BlueCross's counterclaim for reimbursement under the Plan that the surgery-necessitating injuries arose out of the accident, it is reasonable for the Plan administrator to have reached the same conclusion." *Id.*

In support of its position, BNA cites several other cases in which courts have stated that an ERISA plan was not required to prove that a tortfeasor caused the beneficiary's injuries in order to be reimbursed from the beneficiary's settlement with the tortfeasor. *See, e.g., McIntosh v. Pac. Holding Co.*, 992 F.2d 882 (9th Cir. 1993); *Brown & Williamson Tobacco Corp. v. Collier*, Civ. No. 5:09-cv-00125, 2010 WL 1487772, at *6 (M.D. Ga. Apr. 13, 2010); *Essex v.*

*Randall*, Civ. No. DKC-03-3276, 2005 WL 600335, at *6 (D. Md. Mar. 15, 2005); *Steffens*, 804 N.W.2d at 210 n.22.

Moreover, it is clear that the mere designation of settlement proceeds for "pain and suffering" (or failure specifically to designate the settlement proceeds for medical expenses) does not defeat a plan's right to reimbursement.  *See, e.g., Mid Atl. Med. Servs., Inc. v. Do*, 294 F. Supp. 2d 695, 698, 701 (D. Md. 2003) (holding that, where beneficiary was injured in car accident and obtained a settlement "in a manner that does not specify the nature of compensation, it may be presumed that said recovery is intended to cover medical expenses"); *see also Primax Recoveries, Inc. v. Young*, 83 F. App'x 523, 525-26 (4th Cir. 2003) (holding, in case where beneficiary was injured in car accident, that plan was entitled to recover where the settlement proceeds were not designated); *Singleton v. Bd. of Trs. of IBEW Local 613 & Contributing Emp'rs Health & Welfare Fund*, 830 F. Supp. 630, 631 (N.D. Ga. 1993) (holding, where beneficiary was injured in car accident, that plan was entitled to recover from settlement proceeds that were specifically designated for pain and suffering); *Travitz v. N.E. Dept. ILGWU Health & Welfare Fund*, 818 F. Supp. 761, 770 & n.11 (M.D. Pa. 1993) (same).

In each of the cases above, cited by plaintiff, the beneficiary suffered a physical injury which resulted in the plan's payment of medical expenses.   The beneficiary then reached a settlement with the alleged tortfeasor.   In each case, the settlement came in lieu of a determination or admission of whether the tortfeasor actually caused the injury to the beneficiary.   But, there was no serious dispute in any of the cases that the beneficiary's injury, allegedly caused by the tortfeasor, had resulted in the payment of medical expenses by the plan.[12]

---

[12] It is noteworthy that almost all of the cases cited by plaintiff arose from vehicular accidents, which typically present a relatively uncomplicated causal relationship between the injury allegedly caused by the tortfeasor and the resulting medical treatment.  In *Do*, for instance, Judge Marvin J. Garbis of this court held that a plan was entitled to recover, from the proceeds of

Arguably, though, this is not a case in which the beneficiary is engaged in the obvious "lexicological legerdemain" of designating a settlement for physical injuries as a settlement only for "pain and suffering," in order to obtain a double recovery from both the tortfeasor and her health insurer. *Herberger's*, 17 F. Supp. 2d at 936. In contrast to the beneficiary in *Herberger's*, the Chases contend that FMH's alleged negligence in actuality caused no injury other than pain and suffering. Based on the alleged review by the surgeons for both Ms. Chase and FMH, the Chases assert that the second round of surgeries and post-surgical care resulted from Ms. Chase's infection, which was unrelated to FMH's care. Put another way, according to the Chases, the alleged negligence of FMH did not cause the infection or contribute to the necessity or scope of the second round of surgeries. Rather, FMH failed to discover the existing infection, thus delaying the surgical care that Ms. Chase inevitably would have needed. So, the delay caused unnecessary pain and suffering, but had nothing to do with the need for the second round of surgeries.

In the light most favorable to the Chases, this case is akin to *Administrative Committee v. Kern*, 72 F. Supp. 2d 1051 (W.D. Ark. 1999), the leading case on which the Chases rely. In that case, a beneficiary with a chronic rash was treated by her doctors by intravenous administration of a steroid. *Id.* at 1051. She suffered congestive heart failure, and later "developed avascular necrosis necessitating replacement of both hip [joints] and both shoulder joints." *Id.* at 1052. She sued her doctors, alleging that they had administered excessive doses of the steroid, which had caused both the congestive heart failure and the necrosis. *Id.* Subsequently, she reached a settlement with the doctors, from which her benefit plan sought reimbursement for all amounts it

---

a settlement arising from injuries the beneficiary sustained in a car accident, for medical expenses the plan had paid. But, he expressly declined to endorse a plan fiduciary's argument that "a lien . . . could attach to a third party recovery that was not paid for medical expenses." *Do*, 294 F. Supp. 2d at 701.

had paid for her medical care for both conditions, pursuant to plan provisions that gave the plan

the right to reimbursement from any payment "'made by person(s) considered responsible for the

condition giving rise to the medical expense.'"  *Id.* at 1054 (quoting plan).   The beneficiary

argued, however, that the plan was only entitled to recover for the amounts it had paid for care

for her congestive heart failure, because "although she initially alleged the [steroid] caused the

avascular necrosis which necessitated the joint replacements, she was unable to prove this" in the

medical malpractice suit.  *Id.*  Indeed, before the settlement negotiations in the malpractice suit

began, her own experts had opined that the necrosis could not have resulted from the doctors'

alleged malpractice.  *Id.*

The *Kern* Court held that, in making its determination as to reimbursement, the plan's

administrator was required to consider whether the beneficiary's doctors were responsible for her

necrosis.  *Id.* at 1055.   In reasoning that is persuasive here, the *Kern* Court said, *id.* at 1054-55

(internal citations omitted):

> The Plan argues it is not required to prove the negligence of the
> malpractice defendants before it can assert a valid claim to the settlement money.
> As a general proposition, the court agrees with this statement.
>
> However, the Plan seeks to [oversimplify] the issues in this case.  Were
> Kern arguing that an ERISA Plan must always bear the burden of proving the
> alleged tortfeasor's fault before it could collect under a reimbursement provision,
> we would reject this argument out of hand.  If a Plan participant prevails on a
> claim against a third party based on an assertion of fault either through trial or
> settlement, the participant cannot avoid the reimbursement provision by arguing
> the Plan must fend for itself.  Thus in the majority of cases, the Plan need not
> separately prove that the tortfeasor was at fault and his or her conduct proximately
> caused the injuries resulting in the need for medical treatment.
>
> However, where, as here, the Plan participant seeks damages for multiple
> medical conditions and is forced to abandon a portion of her claim because she
> finds herself unable to prove the tortfeasor's fault proximately caused one of her
> medical conditions, in this case the avascular necrosis which resulted in the need
> for joint replacements, the Plan may not, without establishing a connection
> between the tortfeasor's conduct and the medical condition, seek reimbursement

for medical expenses incurred as a result of that condition.  Here, there is no evidence Kern dropped her claim that the malpractice defendants caused her avascular necrosis to avoid her reimbursement obligation.  Rather, the evidence indicates she was, because of a lack of supporting evidence, forced to abandon this portion of her malpractice claim.

BNA maintains that the SPD "does not set forth any requirement that the injury giving rise to the bills for which BNA seeks reimbursement be causally related to the actions and/or omissions of FMH."  BNA Motion at 19.  The plain language of the SPD dispels BNA's contention, however.  The "Reimbursement" provision of the SPD states that, "if a Covered Person receives any payment from any Responsible Party . . . as a result of an injury, illness, or condition, the plan has the right to recover from, and be reimbursed by, the Covered Person for all amounts this plan has paid and will pay *as a result of that injury, illness, or condition*, from such payment."  SPD at 51 (emphasis added).  This language requires a causal relationship between the injury, illness, or condition caused by the Responsible Party and the amounts paid by the Plan that are subject to reimbursement.  Similarly, the "Lien Rights" provision of the SPD states that "the plan will automatically have a lien to the extent of benefits paid by the plan *for the treatment of the illness, injury, or condition for which the Responsible Party is liable*."  *Id.* (emphasis added).

To be sure, the SPD expressly provides that it does not matter whether the Responsible Party admits liability, nor does it matter how the settlement is labeled: the Plan "is entitled to full recovery regardless of whether any liability for payment is admitted by any Responsible Party," and "is entitled to recover from any and all settlements or judgments, even those designated as pain and suffering, non-economic damages, and/or general damages only."  *Id.*  Moreover, the Plan does not have to establish a tortfeasor's actual liability: "the term 'Responsible Party'

means any party *actually, possibly, or potentially responsible* for making any payment due to a Covered Person's injury, illness, or condition." *Id.* at 50 (emphasis added).

Thus, the Plan is not obligated to establish that the Responsible Party caused the beneficiary's injury. But, the Plan is obligated to establish that the medical care for which the Plan provided coverage arose from an injury for which the Responsible Party is "actually, possibly, or potentially responsible." *Id.* An example provided by the Wisconsin Supreme Court in *Steffens*, on which BNA relies, illustrates this distinction. The *Steffens* Court rejected the beneficiary's argument that the plan was required to "prove causation." *Steffens*, 804 N.W.2d at 210 n.22. But, the *Steffens* Court continued, *id.* (emphasis added):

> Pursuant to the terms [of the plan], the question is whether the administrator's determination *that the surgery-necessitating injuries arose from the accident* was arbitrary and capricious, not whether BlueCross must prove the accident caused the injuries.
>
> An example provided by Steffens illustrates his error in grounding his argument in tort law. In an attempt to argue that BlueCross must prove causation, he contends: "For instance, if an insured injures his arm in a car accident and subsequently has an unrelated surgery on his toe, the insurer would be able to take money out of a settlement regarding the arm for bills the insurer paid on the toe surgery, if not required to prove causation." ... [T]his example reaches an erroneous conclusion. Under the Plan, the insurer would not be capable of reimbursement from the settlement money *unless* the Plan administrator reasonably determined that *the toe surgery arose from the car accident.* Such a determination would be arbitrary and capricious since the example explicitly states that the two events were unrelated.

Here, the Chases argue that they are in the same position as the arm and toe surgery patient in Steffens's example. According to the Chases, Ms. Chase's second round of surgeries (like the toe surgery in the *Steffens* example) was unrelated to the alleged negligence of FMH (analogous to the arm injury in the *Steffens* example). Defendants maintain that, even if the FMH nurses had timely detected the infection of the perineal wound at the outset, Ms. Chase still would have required the second round of surgeries.

*McIntosh v. Pacific Holding Co.*, *supra*, 992 F.2d 882, another case on which BNA relies, also illustrates this principle.   In *McIntosh*, the Eighth Circuit concluded that a benefits plan was entitled to recover from a beneficiary's settlement with the parties who allegedly caused her car accident, "because the medical expenses received by [the beneficiary] *arose out of the physical injury from which all of her claims against third parties are derived*." *Id.* at 885 (emphasis added).

In sum, BNA's interpretation of the SPD is contrary to the SPD's plain meaning, and this conclusion is bolstered by the case law interpreting analogous plan language.   Although the Plan's entitlement to reimbursement does not depend on proving that FMH actually caused injury to Ms. Chase, or upon the particular language used in artful drafting of the settlement agreement between FMH and the Chases, the Plan's entitlement does depend on whether the Plan paid benefits for Ms. Chase "as a result of that injury, illness, or condition" for which FMH was allegedly liable.   SPD at 51.   Put another way, in the words of *Steffens* and *McIntosh*, the Plan's entitlement to reimbursement from the settlement depends on whether the medical expenses it paid "arose out of" the injury on which the settlement was based.

BNA's motion is predicated on the proposition that, as a matter of law, the SPD does not require the establishment of such a connection.   That proposition contradicts the plain language of the SPD.   *See Blackshear*, *supra*, 509 F.3d at 639.   Accordingly, I will deny BNA's summary judgment motion.

### D.  Chase Motion

The Chases' motion must also be denied.   The Chases claim that they are entitled to summary judgment because FMH's negligence did not result in the second round of surgeries, the expenses of which were paid by the Plan.   However, at this juncture, the Chases have offered

no admissible evidence to prove that contention.  To be sure, BNA has not propounded any evidence to the contrary.  But, as noted, the parties expressly agreed to delay expert discovery until after the pending motions were resolved.  *See* Scheduling Order at 2.

More important, I am not convinced that it is this Court's role, in the first instance, to make the determination as to whether the medical expenses paid by the Plan resulted from FMH's alleged negligence.  The SPD reserves to the Plan the "right to conduct an investigation regarding the injury, illness, or condition to identify any Responsible Party."  SPD at 52. Moreover, the SPD grants to the Plan's "Claims Administrator" the "sole authority and discretion to resolve all disputes regarding the interpretation" of the Subrogation and Right of Recovery Provision.  *Id.*  It is apparent that the SPD vests the Plan or its administrator with the authority to make the initial determination of the Plan's right to subrogation and reimbursement. This is consistent with the cases discussed above, which have reviewed for abuse of discretion such a determination by a plan.  *See, e.g.*, *Kern*, 72 F. Supp. 2d at 2053-54; *Steffens*, 804 N.W.2d at 209-10.

Nevertheless, the Plan or its administrator must make its determination in accordance with a permissible interpretation of the SPD.  Although the SPD vests interpretive authority with the Claims Administrator, that authority extends only to resolving ambiguity in the SPD language.

In *Kerns*, the court directed a remand to the Plan for a determination as to reimbursement and subrogation on the basis of the correct standard under the SPD.  It said:

> From the materials submitted to the court, it does not appear that the Plan administrator has considered the specific issue on which this case turns. That is, whether [the beneficiary's doctors] were "responsible for the condition [avascular necrosis] giving rise to the medical expense."  Instead, it appears the Plan has merely totaled all medical expenses it paid on Kern's behalf after the March of 1992 hospitalization without regard to whether those expenses arose as a result of

the fluid overload and congestive heart failure or as a result of the avascular necrosis. Neither party has submitted any materials indicating the Plan considered this specific issue.

Accordingly, this matter is not ready for review by the court.  Instead, the administrator must first be given the opportunity to determine what portion of the [medical expenses paid by the plan] it believes is subject to the reimbursement provision.  In making this determination, the administrator must determine whether [the beneficiary's doctors] were responsible for the avascular necrosis which necessitated the joint replacements.

*Kerns*, 72 F. Supp. 2d at 1055 (some alterations in original).  Accordingly, the court issued an order directing that the case be "stayed and administratively terminated for the [plan] to determine what portion of the . . . medical expenses it paid is subject to the reimbursement provision," and stated: "At the conclusion of the administrative proceedings, either party may, if necessary, file a motion to reopen the case." *Id.* at 1055-56.

As noted, neither side has provided any evidence documenting a decision by the Plan's administrator regarding the Plan's entitlement to reimbursement.  Moreover, neither side has requested a remand to the Plan.  Nevertheless, a district court has discretion to remand an ERISA dispute to a plan claims administrator for redetermination under a proper standard.  *See Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 362-63 (4th Cir. 2008); *see also Smith v. Continental Cas. Co.*, 369 F.3d 412, 421 (4th Cir. 2004) ("If the district court concludes that Continental Casualty failed to consider this Plan language, it can remand the case to Continental Casualty for further administrative review."); *Evans v. Metropolitan Life Ins. Co.*, 358 F.3d 307, 312 (4th Cir. 2004) ("Because MetLife abused its discretion . . . , we vacate the judgment of the district court and direct the district court to remand this case for further administrative review by MetLife consistent with this opinion.").

To be sure, "'remand should be used sparingly.'"  *Champion*, 550 U.S. at 362 (quoting *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999)).  However, remand is appropriate

when a case involves "complex medical issues crucial to the interpretation and application of plan terms," *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1025 (4th Cir. 1993). If a court "believes the [plan] administrator lacked adequate evidence on which to base a decision, 'the proper course [is] to remand to the [administrator] for a new determination, not to bring additional evidence before the district court.'" *Elliott*, 190 F.3d at 609 (quoting *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1007 (4th Cir. 1985)).

In my view, a remand to the Plan may be appropriate in this instance.[13]  Because the parties have not addressed the propriety of remand to the Plan, in the Order that accompanies this Memorandum Opinion, I will direct the parties to submit letter briefs as to whether a remand, such as was ordered in *Kerns*, is appropriate in this case.  In the meantime, I will stay the commencement of expert discovery.

### Conclusion

For the foregoing reasons, the summary judgment motions submitted by both sides will be denied.  An appropriate Order follows.

Date:   August 24, 2012                            _____/s/_____
                                                   Ellen Lipton Hollander
                                                   United States District Judge

---

[13]  BNA has argued that the Chases breached their responsibilities under the SPD by failing to involve a representative of the Plan in the settlement negotiations with FMH.  Because the amount of the settlement exceeds the amount that the Plan seeks to recover, the Plan is not harmed by that alleged breach, so long as it has the opportunity to make a determination as to reimbursement and subrogation on the basis of a complete record as to Ms. Chase's condition and treatment.  A remand would afford the Plan that opportunity.